FILED
2013 Jan-03  AM 11:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **Daniel Tidwell,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **CIVIL ACTION NUMBER:** |
| **Edward Parr, et al.,** ] | **1:11-cv-2612-KOB** |
| ] | |
| **Defendants.** ] | |
| ] | |
| ] | |

**MEMORANDUM OPINION**

This matter comes before the court on the Motion for Summary Judgment filed by the

Defendants Alabama Institute for Deaf and Blind, its operating division E.H. Gentry, and Edward

Parr, an instructor at E.H. Gentry. (Doc. 13). This case arises from an incident that occurred at

E.H. Gentry on July 23, 2009. Plaintiff Daniel Tidwell, an adult student at E.H. Gentry, was

temporarily incapacitated by a then-unknown cause and claims that the defendants mistreated

him and discriminated against him because of his disability. Mr. Tidwell filed a seven count

complaint, charging the defendants with violations of federal and state laws for their alleged

mistreatment of him. The defendants now move for summary judgment because they argue they

are entitled to judgment as matter of law on all of Mr. Tidwell's claims.  For the reasons

articulated below, the court finds that no genuine issue of material fact exists and that the

defendants are entitled to judgment as a matter of law. The court will GRANT the Defendants'

motion in its entirety and simultaneously enter an order to that effect.

I.   STATEMENT OF FACTS

   A.   Factual History

Defendant E.H. Gentry is an operating division of Defendant Alabama Institute for Deaf and Blind ("AIDB"), the official state agency charged with conducting the state educational and training programs for hearing impaired and visually handicapped individuals (E.H. Gentry and AIDB are referred to collectively as "AIDB" throughout). The Alabama Department of Rehabilitation Services ("ADRS") operates the Business Enterprise Program ("BEP") for blind adults under and in accordance with the Randolph-Sheppard Act, 20 U.S.C. § 107. The Randolph-Sheppard Act provides federal funding to assist states to train the blind to manage and operate concession stations and vending businesses on federal, state, and municipal property.

ADRS provides the BEP training at E.H. Gentry, and E.H. Gentry conducts two six-month BEP trainings each year, one beginning in January and one beginning in July. To participate in BEP training, ADRS must first approve the blind individuals.  BEP training is rigorous and demanding; it is designed to do everything possible to assure that the individuals will succeed when operating a business. Mr. Parr stated in an affidavit that the BEP graduates who operate a vendor route must be able to cope with extreme physical demands like "lifting heavy boxes of supplies and inventory; pushing loaded supply carts over considerable distance as they would in serving a vendor route." (Doc. 13-5, at 2). Plaintiff Mr. Tidwell testified that the job for which he was training had no physical requirements because a helper does all of the physical tasks such as lifting boxes or pulling carts. (Doc. 19-1, at 48).

When a student successfully completes BEP training, E.H. Gentry notifies ADRS, and ADRS licenses the individual. ADRS then works with the blind licensee to find employment, but

neither ADRS nor AIDB provide the individuals with employment.

Mr. Tidwell is legally blind. He completed the BEP training program in 1996 and operated a vending route in Tuscaloosa until 2000 when ADRS terminated his route. In 2008, Mr. Tidwell contacted ADRS about a route at Redstone Arsenal, and an ADRS representative told him he would need to obtain a Serve Safe certification, in addition to BEP retraining, to work at a "gift shop/ lunch place" at Redstone Arsenal. (Doc. 18, at 4).  In early 2009, ADRS approved Mr. Tidwell to receive retraining to update his business skills and obtain a Serve Safe certificate. Mr. Tidwell did not have to complete the full-six month BEP program because he was a prior licensee, but he needed retraining.

Mr. Tidwell reenrolled for retraining beginning in March 2009 at E.H. Gentry. Mr. Tidwell obtained his Serve Safe certification, but did not successfully complete the retraining program. Mr. Parr and Mr. Tidwell both testified, however, that an individual's license does not expire. While at E.H. Gentry, Mr. Tidwell missed a lot of work and classes because of medical and other reasons. Mr. Parr stated in his affidavit that Mr. Tidwell's absences frustrated the nursing staff at E.H. Gentry because Mr. Tidwell never provided accurate information about what medicines he was taking or what medical and health problems were causing him to miss class. (Doc. 13-5, at 3). Mr. Tidwell, however, testified that he provided his medical information to the nursing staff before he entered the BEP program and "complied with what the nurses asked [him]." (Doc. 19-1, at 66-68).  In May 2009, AIDB terminated Mr. Tidwell from the retraining program because the staff determined he needed to complete the full six-month BEP training program and because Mr. Tidwell had missed too many classes.  E.H. Gentry staff told Mr. Tidwell that they would hold open a spot for him in the July 2009 BEP course.

The July BEP course started on July 20, 2009, but Mr. Tidwell arrived late and missed the first classes. Jerry McKee, Mr. Tidwell's case worker, met with Mr. Tidwell and explained that if he repeated the same erratic attendance pattern that he had exhibited in his previous stint of retraining, he would be terminated from the program again.

On July 22, 2009, Mr. Tidwell rode an exercise bike for about 10 minutes for what he testified he thought was about five-tenths of a mile. (Doc. 19-1, at 70). Mr. Tidwell left the exercise room, ate, and went to bed in his dorm room.  Between 1:00 a.m. and 1:30 a.m. Mr. Tidwell woke up and went to the bathroom. On the way back from the restroom, Mr. Tidwell turned the light off in his dorm room and then fell on the floor. Mr. Tidwell testified that it felt like "somebody cut [his] legs off." (Doc. 19-1, at 71). He then crawled on the ground for about thirty minutes until he could get to the intercom button to call for help.

Onetha Holland, the dormitory aide on duty, received the intercom call and went to Mr. Tidwell's room immediately. Mr. Tidwell claims that he told Ms. Holland he could not feel his legs. (Doc. 19-1, at 76-77).  Mr. Tidwell also claims that he asked Ms. Holland to call an ambulance or to notify his family, but Ms. Holland said she would not be able to do anything until the other staff arrived in the morning. *Id.*  Ms. Holland, however, stated in her affidavit that Mr. Tidwell never asked her or any other E.H. Gentry staff member to call an ambulance. (Doc. 13-8, at 4).  Ms. Holland told Mr. Tidwell that she would make sure he was taken care of as soon as somebody arrived in the morning. Mr. Tidwell weighs approximately two hundred pounds, and Ms. Holland stated in an affidavit that she could not lift him into his bed. (Doc. 13-8, at 2).

Mr. Tidwell alleges that Ms. Holland left him alone on the floor of his dorm room from approximately 1:30 a.m. until 8:00 a.m. when the other staff arrived. (Doc. 19-1, at 79-80). Mr.

4

Tidwell testified that he was "scared to death . . . [and] thought [he] was going to die." *Id.* at 81. Ms. Holland, however, testified that she checked on Mr. Tidwell several times throughout the night and that he said he was sore and needed to rest but did not seem to be in distress. (Doc. 13-8, at 2-3).

Mr. Tidwell claims that from the time he fell he was totally incapacitated and had to urinate into bottles and on himself throughout the night. (Doc. 19-1, at 79). Ms. Holland, however, stated in her affidavit that she did not smell any urine or see any bottles of urine in Mr. Tidwell's room; she also stated that Mr. Tidwell did not ask her to go to the bathroom, and if he had, she would have helped him to get to the restroom. (Doc. 13-8, at 3).

Just before 7:00 a.m., Ms. Holland called Nurse Patricia Hicks, who had just reported to work at E.H. Gentry. Ms. Holland asked Nurse Hicks to come with her to Mr. Tidwell's room because he needed assistance. Nurse Hicks testified that she called Defendant Edward Parr, an E.H. Gentry instructor, and the two of them went to Mr. Tidwell's room together. Nurse Hicks testified that when they arrived, "[Mr. Tidwell] was sitting comfortably on the floor. He was in no apparent distress at that point. . . . He said that he had ridden the bicycle the night before and that he overdid it, he doesn't normally exercise that way and his body doesn't react like other people." (Doc. 13-4, at 10).  Nurse Hicks testified that she checked the strength in Mr. Tidwell's legs by getting him to push his feet against her hands and that Mr. Tidwell did not report any pain or that he had fallen. (Doc. 13-4, at 10-11).  Nurse Hicks did not see any evidence of a fall such as bruising or cuts. (Doc. 13-4, at 10). Mr. Tidwell disputes that Nurse Hicks ever tested his legs for strength and testified that she just checked his blood pressure and vital signs and then told him he had a pulled muscle in his back. *Id.* at 86.

5

Mr. Tidwell disputes that Nurse Hicks and Mr. Parr came to his room around 7:30 a.m.

Instead, he testified that at 8:30 a.m., Mr. Parr came to his room with four other students, his

caseworker, Mr. McKee, and two nurses, presumably Nurse Patricia Martin and Nurse Hicks.

(Doc. 13-1, at 83-84).  Mr. Tidwell testified that he "begged" Nurses Hicks and Martin to call

him an ambulance at that time, but they refused. (Doc. 19-1, at 40).  Both Ms. Holland and Nurse

Hicks, however, testified that Mr. Tidwell never requested they call an ambulance. (Doc. 13-8, at

4; Doc. 13-6, at 4).

    Mr. Tidwell testified that Mr. Parr told him to "man up and get up out of the floor" and

then kicked Mr. Tidwell on the bottom of his foot. (Doc. 13-1, at 85). Mr. Tidwell told Mr. Parr

that he could not get up and he did not know what was wrong, and Mr. Tidwell testified that he

may have mentioned something about riding the bicycle the night before. *Id.* at 91-92.  Mr. Parr

and Nurse Hicks both testified that Mr. Parr never touched or kicked Mr. Tidwell and never

spoke to him in an abusive manner. (Doc. 13-3, at 23-24; Doc. 13-5, at 8; Doc. 13-6, at 3).

Mr. Parr called several students to help him move Mr. Tidwell to a more comfortable

position. Mr. Parr and the students got a mattress off of Mr. Tidwell's bed, put it on the floor,

and the students helped Mr. Tidwell onto it.  Mr. Tidwell requested a wheelchair but was told

that E.H. Gentry did not have one. Nurse Hicks testified that she was "uncomfortable giving a

non-wheelchair user a wheelchair for use during the day" because she was concerned about Mr.

Tidwell's safety. (Doc. 13-4, at 19).  Mr. Tidwell claims that he again requested an ambulance

but was told that E.H. Gentry could not call an ambulance and that one of his family members

would have to come pick him up. (Doc. 13-1, at 90). Nurse Hicks testified that she offered to call

an ambulance for Mr. Tidwell, but explained that if he were to go to the emergency room for sore

muscles via ambulance, it was "likely that [his insurance] would not pay for the ambulance ride." (Doc. 13-4, at 14-15).

According to Mr. Tidwell, Mr. Parr, Mr. McKee, the two nurses, and four of his fellow students stayed in his room for about forty-fives minutes. During that time, Mr. Tidwell testified that he "felt like a freakshow everybody was looking at" because he was a "mess" lying on the floor where he had urinated on himself. (Doc. 13-2, at 158).

Nurse Hicks and Mr. Parr discussed the best plan for Mr. Tidwell and decided that he should go home to recover. Mr. Tidwell claims that from approximately 9:15 a.m. when everyone left his dorm room, he was unattended until approximately 1:45 p.m. when his girlfriend picked him up at E.H. Gentry. (Doc. 13-1, at 94-97). Nurse Hicks, however, testified that she checked on him and brought him water and crackers and that Mr. McKee, Mr. Tidwell's case worker, was with him in his room. (Doc. 13-4, at 21-22).  Mr. McKee stated in his affidavit that "[a]t no time on July 23, 2009 did [Mr.] Tidwell complain to me or anyone else in my presence that he had been mistreated." (Doc. 13-7, at 1). Mr. Tidwell, however, testified that he complained about his treatment as the events of July 23, 2009 were transpiring. (Doc. 13-1, at 101).

Mr. Tidwell testified that at approximately 1:45 p.m. when his girlfriend picked him up to take him home, he was delirious. (Doc. 13-2, at 127).  At that time, several students helped Mr. Tidwell from the mattress on the floor into a wheelchair. Mr. Parr, who is trained in emergency medical procedures, supervised the transfer, but Mr. Tidwell claims that the students hurt him while they were putting him in the wheelchair and then transferring him to the car. (Doc. 13-1, at 101).

Mr. Tidwell's girlfriend drove him to his home in Walker County, approximately three hours away. When Mr. Tidwell got home, he could not get out of the car so he called volunteer fire fighters to help move him from the car to a recliner in his house. Mr. Tidwell sat in the recliner until the middle of the night, when he called an ambulance to take him to the hospital. At the hospital, a doctor told Mr. Tidwell that he was going into cardiac arrest because a "virus attack[ed his] potassium" and placed a stint in his heart to provide the necessary potassium. (Doc. 13-1, at 110-11). Mr. Tidwell left the hospital on July 26, 2009. Mr. Tidwell had never had a potassium problem before July 23, 2009 and has not had a problem since then.

On July 27 or 28, 2009, Mr. Tidwell told Mr. McKee that his doctors had released him to return to school. Mr. McKee asked Mr. Tidwell to send his medical release to him and return for classes on July 29th. Mr. Tidwell sent his medical release on July 28th, but it did not contain any information about the medical condition that caused his weakened condition on July 23rd.  Mr. Tidwell arrived late for classes on July 29th, and the staff then discussed whether Mr. Tidwell should continue with the BEP training course. Mr. Parr testified that he felt that Mr. Tidwell had already missed too many classes to make up, and the staff did not know what accommodations would have to be made for Mr. Tidwell because they did not know about his new medical condition. (Doc. 13-3, at 51). Ultimately, the staff concluded that "it would not be in [Mr. Tidwell's] best interest or AIDB's for [Mr.] Tidwell to continue until his medical records were received and it was safe for him to continue [the training program]." (Doc. 14, at 14).

The staff met with Mr. Tidwell on July 29th and explained their decision to terminate Mr. Tidwell's participation in the July training program. The staff also told Mr. Tidwell that he would be readmitted to the January 2010 training program if he sent in his medical information.

8

In an effort to obtain Mr. Tidwell's updated medical information, Mr. Parr asked Mr. Tidwell to sign two medical releases. Mr. Tidwell signed the releases, and E.H. Gentry sent them to the medical providers. The medical release form had a clause at the bottom stating, "This signed release form will be effective for:_____" and an E.H. Gentry staff member wrote "termination of program" in the blank, indicating that the release form would not be valid after the termination of Mr. Tidwell's enrollment in the program. ("Alabama Department of Rehabilitation Services Authorization for Use, Disclosure, and/ or Release of Information," Doc. 13-4, at 19).

Sometime after signing the release and agreeing to have his medical information sent to AIDB, Mr. Tidwell told his medical providers *not* to send his records to AIDB. (Doc. 13-1, at 127).  Mr. Tidwell testified that he tried to call to reenter the program, but no one would return his calls so he wrote two letters requesting reentry. *Id.* at 59. On September 4, 2009, Mr. Tidwell wrote a letter to ADRS to request reenrollment for the January 2010 BEP training program. Patty Harper, Director of Services for the Blind, sent Mr. Tidwell a letter saying that AIDB needed his medical records and that Mr. Tidwell needed to contact his rehab counselor before he could reenter the program. After receiving this letter, Mr. Tidwell did not contact his doctors to request they send his medical records and did not contact his rehab counselor. On September 24, 2010, Hayden Steward, Mr. Tidwell's ADRS counselor, wrote a letter to Mr. Tidwell confirming that Mr. Tidwell had decided not to seek further training or employment through ADRS.

Mr. Tidwell testified that Mr. Parr mailed him his Serve Safe License several months after his termination from the program, but Mr. Parr did not place Mr. Tidwell on the list of licensed individuals eligible for employment. (Doc. 13-1, at 124). Mr. Tidwell has not worked

since his termination from the BEP training program in July of 2009.

      B.    Procedural History

Mr. Tidwell filed an eight count complaint against Mr. Parr, E.H. Gentry, AIDB, and five fictitious defendants in the Northern District of Alabama on July 19, 2011. Count I charges all of the defendants with violating 42 U.S.C. § 1983 by depriving him of his rights by "failing to accommodate him by providing him a wheelchair, by failing to call an ambulance, by allowing [him] to remain on the floor for 12 ½ hours, by humiliating [him], assaulting [him], and by wrongfully terminating him from the E.H. Gentry BEP program." (Doc.1, at 6-7).

Count II charges AIDB, E.H. Gentry, and Mr. Parr with a violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. Count III charges AIDB, E.H. Gentry, and Mr. Parr with a violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Count IV charges Mr. Parr and several fictitious parties with state law assault and battery in their individual capacities. Count V charges all of the defendants with state law false imprisonment in their individual capacities. Count VI charges all of the defendants with state law intrusion upon seclusion in their individual capacities. Count VII (incorrectly labeled VI) charges all of the defendants with state law outrage for behavior that "goes beyond all possible bounds of decency" in their individual capacities. (Doc. 1, at 10). Count VIII (incorrectly labeled VII) charges "Defendant," which the court assumes to be E.H. Gentry, and/ or AIDB with state law negligent hiring, training, supervision, and retention of employees.

Because the complaint was misnumbered, the parties failed to address the intrusion upon seclusion claim in their briefs in support of and opposition to summary judgment. The court afforded the parties an opportunity to supplement their briefs and address this claim. (Doc. 26).

The court considers these arguments (docs. 27 & 28) as well as those from the original briefing of the motion for summary judgment (docs. 14, 18, & 22) in this opinion.

II.      STANDARD OF REVIEW

 Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.  *Celotex*, 477 U.S. at 322–23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

In reviewing the evidence submitted, the court must "view the evidence presented

11

through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

Furthermore, all evidence and reasonable inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The nonmoving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* Additionally, "conclusory assertions. . ., in the absence of supporting evidence, are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997). After both parties have addressed the motion for summary judgment, the court shall grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

III.   LEGAL ANLYSIS

The court recognizes that genuine disputes of fact exist in the record. However, the court finds that no genuine issues of *material* fact exist in the record that inform the court's decision. In this opinion, the court makes all reasonable inferences for Mr. Parr and resolves all factual disputes in Mr. Parr's favor.

A.   Fictitious Parties

Although no motion  before the court specifically requests the dismissal of the fictitious

parties, the court *sua sponte* addresses this issue.  Fictitious party practice generally is not permitted in federal court.  *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n. 1 (11th Cir. 1997).  Accordingly, the court will DISMISS WITH PREJUDICE all fictitious party defendants in this case.

> B.   Mr. Tidwell's § 1983 claim against E.H. Gentry and AIDB

To succeed on his § 1983 claim against AIDB, an official state agency, and E.H. Gentry, its operating division, Mr. Tidwell must show that "he . . . was deprived of a federal right by a person acting under color of state law." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001).  A state is not a "person" subject to suit within the meaning of § 1983, and state agencies "share the same Eleventh Amendment immunity as do states." *Taylor v. Dept. of Pub. Safety*, 142 F. App'x 373, 374 (11th Cir. 2005) (citing *Fouche v. Jekyll Island-State Park Auth.*, 713 F.2d 1518, 1520-23 (11th Cir. 1983)).  "Therefore, the Eleventh Amendment bars a federal court from exercising jurisdiction over a lawsuit against a non-consenting State and its agencies." *Id.*

AIDB argues that Mr. Tidwell "cannot pursue a claim against AIDB under Section 1983 [because] [t]he State of Alabama and its agencies, like AIDB, are not 'persons' for purposes of a damages action under Section 1983." (Doc. 22, at 9).[1]  AIDB is the official state agency charged with conducting the state educational and training programs for hearing impaired and visually

---

[1] Mr. Tidwell alleges in his Response that the Defendants argued that only AIDB, not E.H. Gentry, is entitled to summary judgment. (Doc. 18, at 14 n. 1). As the Defendants correctly point out in their Reply Brief, "AIDB" in the Defendants' Brief collectively refers to AIDB and E.H. Gentry, AIDB's operating division. (Doc. 22, at 9 n. 1). The court will construe all of the Defendants' arguments in its motion for summary judgment as applying to both AIDB and E.H. Gentry.

handicapped individuals. Ala. Code § 21-2-3.  E.H. Gentry is an operating division of AIDB that

provides vocational training for adult blind students and is a facility that operates as part of a

state agency. (Doc. 13-5, at 1). As state agencies and arms of the state of Alabama, both AIDB

and E.H. Gentry are  immune from suit under § 1983. *See Taylor*, 142 F. App'x at 374. Thus, the

court will GRANT summary judgment on Count I against AIDB and E.H. Gentry.

      C.     Mr. Tidwell's federal claims against Mr. Parr

          1.     Mr. Tidwell's § 1983 claim against Mr. Parr in his individual capacity

In his Complaint, Mr. Tidwell alleges that Mr. Parr deprived him of his rights by "failing

to accommodate him by providing him a wheelchair, by failing to call an ambulance, by allowing

Tidwell to remain on the floor for 12 ½ hours, by humiliating Tidwell, assaulting Tidwell, and by

wrongfully terminating him from the E.H. Gentry BEP Program." (Doc. 1, at 6-7). Mr. Parr

argues that he is entitled to summary judgment on the § 1983 claim because a § 1983 claim

cannot lie for denial of accommodation of disability and because he is immune from the § 1983

claim under the doctrine of qualified immunity.

The Defendants argue that "'a plaintiff cannot maintain a section 1983 action in lieu of-or

in addition to- a Rehabilitation Act or ADA cause of action if the only alleged deprivation is the

[plaintiff's] rights created by the Rehabilitation Act and the ADA.'" *Badillo v. Thorpe*, 158 F.

App'x 208, 213 (11th Cir. 2005) (per curiam) (quoting *Holbrook v. City of Alpharetta, Ga.*, 112

F.3d 1522, 1531 (11th Cir. 1997)).  Mr. Tidwell points out that *Badillo v. Thorpe* is a *per curiam*

decision and thus not binding on the court. (Doc. 18, at 12).   Mr. Tidwell is correct that *Badillo*

is not binding on this court, but it is not binding because it is an unpublished decision, not

because it is a per curiam decision. *See In re Howard*, 920 F.2d 887, 887 (11th Cir. 1991) (citing

a per curiam decision as "binding").  Eleventh Circuit unpublished opinions may be considered

by district courts as "persuasive authority." *U.S. v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000)

(citing 11th Cir. R. 36-2). Also, another district court in the Eleventh Circuit has cited *Badillo* for

the proposition that a plaintiff "cannot maintain a 1983 action as a means of vindicating rights

created by the ADA." *Allen v. Brett*, 2007 WL 1732573, *2 (S.D. Ga. 2007).

     While *Badillo* is not binding on this court, it does persuade the court that Mr. Tidwell

cannot bring a § 1983 claim for failure to accommodate his disability. As the Eleventh Circuit

stated, such rights find protection in ADA or Rehab Act claims, and allowing a plaintiff to sue

under the ADA, Rehab Act, *and* § 1983 would be "two bites at precisely the same apple."

*Holbrook*, 112 F.3d at 1531. "[B]oth the Rehabilitation Act and the ADA provide extensive,

comprehensive remedial frameworks that address every aspect of [a plaintiff's] claims under

section 1983." *Id.*  The court, however, construes Mr. Tidwell's § 1983 claim as alleging a

violation of rights beyond that of the failure to accommodate. Mr. Tidwell's complaint alleges

that Mr. Parr humiliated and assaulted Mr. Tidwell in violation of his constitutional rights. Mr.

Tidwell has alleged a proper violation of constitutional rights beyond the rights protected by the

ADA and Rehab Act so as to have a viable § 1983 claim, but Eleventh Amendment qualified

immunity bars Mr. Tidwell's claim in its entirety.

     Qualified immunity protects government officials performing discretionary functions

from suit in their individual capacities unless the official violates "clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Hope v. Pelzer*, 536 U.S.

730, 739 (2002).  "The purpose of this immunity is to allow government officials to carry out

their discretionary duties without the fear of personal liability or harassing litigation, protecting

15

from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citation omitted).

To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). Government officials act within the scope of their discretionary authority if "the actions were (1) 'undertaken pursuant to the performance of [their] duties' and (2) 'within the scope of [their] authority.'" *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988)). "Exercising judgment in the enforcement of the criminal laws of the State" and "in the administration of a department or agency of government" are recognized discretionary functions. *Ex parte Cranman*, 792 So. 2d 392, 402 (Ala. 2000).

Mr. Tidwell offers no facts or law disputing that Mr. Parr was acting within his discretionary authority as an instructor in the BEP program at E.H. Gentry when he took the alleged actions that violated Mr. Tidwell's rights. Because E.H. Gentry is an operating division of AIDB, a state agency, and Mr. Parr was administrating an agency of the state of Alabama, he was engaging in a recognized discretionary function.

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The Supreme Court has articulated a two-part test to determine whether qualified immunity is appropriate. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, the court must ask this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a

16

constitutional right." *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing *Saucier*, 533 U.S. at 201).  Second, "[i]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* (citing *Saucier*, 533 U.S. at 201).

Mr. Tidwell argues that he "has a liberty interest in his bodily integrity, and a constitutional right to privacy and freedom from humiliation and embarrassment" and, because Mr. Parr violated those rights, his § 1983 claim should survive. (Doc. 18, at 14-15). The court is not persuaded that Mr. Tidwell established that Mr. Parr violated his constitutional rights, and even if he did, the court is not persuaded that the right he violated was clearly established.

Mr. Tidwell cites three cases in which the defendants engaged in constitutional violations of an individual's fundamental due process rights. In *Douthit v. Jones*, a jail held a man for an additional thirty days past his authorized confinement without a valid commitment order. 619 F.2d 527, 530 (11th Cir. 1980). In *Shillingford v. Holmes*, a police officer struck a tourist in the face with a nightstick because he was taking a picture of the police apprehending a boy on the street during a Mardi Gras parade. 634 F.2d 263, 264 (5th Cir. 1981).  In *Jefferson v. Ysleta*, a teacher tied a second grade student to her chair with a jump rope for two days during school hours. 817 F.2d 303, 304 (5th Cir. 1987). These egregious and blatant violations of an individual's constitutional rights do not fall within the same realm as Mr. Tidwell's allegations, and Mr. Tidwell has not provided the court with any relevant or applicable case law sufficient to show the "right" Mr. Tidwell supposedly violated was clearly established as is required to preclude qualified immunity.

Mr. Tidwell claims that Mr. Parr violated his Fourteenth Amendment Right to Due

Process by invading his "liberty interest in his bodily integrity and . . . [his] constitutional right to privacy and freedom from humiliation and embarrassment." (Doc. 18, at 14-15).  Mr. Tidwell, however, does not cite any case law acknowledging such a right to be free from humiliation, and as discussed above, the case law he does cite in relation to the right to bodily integrity and privacy is far afield from the incident involved in this case.

Because Mr. Tidwell cannot show that Mr. Parr violated a  "clearly established statutory or constitutional right of which a reasonable person would have known," qualified immunity precludes Mr. Tidwell's § 1983 claim from going forward.  *See Hope*, 536 U.S. at 739 (2002). Because Mr. Tidwell is immune from the § 1983 claim in his individual capacity, the court will GRANT his motion for summary judgment on count I.

2.     Mr. Tidwell's ADA and Rehabilitation Act claims against Mr. Parr in his individual capacity

Mr. Parr argues that individuals cannot be held liable under the ADA or § 504 of the Rehab Act, and thus he is entitled to summary judgment on counts II and III of Mr. Tidwell's Complaint. The Rehab Act uses the same standards as the ADA with the exception of the additional federal funding requirement, and therefore, cases interpreting either are applicable and interchangeable in analyzing claims under either Act. *See Cash v. Smith*, 231 F.3d 1301, 1305 & n.2 (11th Cir. 2000).

 Netiher the ADA nor the Rehab Act recognize individual capacity liability. *See Badillo*, 158 F. App'x at 211 (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2nd Cir. 2001)) ("To the extent that [the plaintiff] seeks to hold [an individual defendant] personally liable, there is no individual capacity liability under Title II of the ADA or [Rehab

18

Act].").  Again, while *Badillo* is not binding precedent, this court finds it persuasive, as have

three other district courts in this circuit for this particular proposition of law. *See Stoddard v. Fla.*

*Bd. of Bar Exam.*, 509 F. Supp. 2d 1117, 1124 (N.D. Fla. 2006); *Gorrell v. Haynes*, 2012 WL

1453575, *2 (S.D. Ga. 2012); and *Walker v. Walker*, 2012 WL 3610526, *5 (M.D. Ga. 2012).

   Mr. Parr cannot be held liable in his individual capacity under the Rehab Act nor the

ADA. Thus, the court will GRANT summary judgment for Mr. Parr as to counts II and III of Mr.

Tidwell's Complaint.

   D.   Mr. Tidwell's state law claims against AIDB and E.H. Gentry

   AIDB argues that it is immune from Mr. Tidwell's claims of assault and battery (count

IV); false imprisonment (count V); intrusion upon seclusion (count VI); outrage (count VII); and

negligent hiring, training, supervision, and retention of employees (count VIII) because state

agencies are immune from suit under the Alabama Constitution. Mr. Tidwell does not present

any arguments disputing AIDB's immunity but instead argues exclusively that Mr. Parr is not

immune in his personal capacity from the state law claims.

   Article I, § 14 of the Alabama Constitution states that "the state of Alabama shall never

be made a defendant in any court of law or equity." Ala. Const. of 1901.  This immunity applies

to the state and its agencies.  *Lyons v. River Road Construction, Inc.*, 858 So. 2d 257, 261 (Ala.

2003) (citing *Ex parte Franklin County Dep't of Human Res.*, 674 So. 2d 1277, 1279 (Ala.

1996)). As discussed above, AIDB and its operating division, E.H. Gentry, are agencies of the

state of Alabama pursuant to Alabama Code § 21-1-23. Thus, AIDB and E.H. Gentry are

immune from the state law claims that Mr. Tidwell asserts against them, and the court will

GRANT summary judgment on counts IV, V, VI, VII, and VIII.

E.    Mr. Tidwell's state law claims against Mr. Parr

Mr. Parr argues that he is immune from Mr. Tidwell's claims of assault and battery (count IV); false imprisonment (count V); intrusion upon seclusion (count VI); and outrage (count VII) because he is a government employee who was engaged in a discretionary function when taking the alleged actions against Mr. Tidwell. Mr. Tidwell argues that Mr. Parr is not immune from the state law claims because he took the alleged actions willfully, maliciously, in bad faith, and beyond his authority.

The Alabama Supreme Court in *Ex parte Cranman* restated the law of immunity for state agents:

> A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>> (1) formulating plans, policies, or designs; or
>> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>>> (a) making administrative adjudications;
>>> (b) allocating resources;
>>> (c) negotiating contracts;
>>> (d) hiring, firing, transferring, assigning, or supervising personnel; or . . . .
>> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or *educating students*.
>
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
>
>> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

792 So. 2d at 405 (emphasis added).

The Supreme Court of Alabama recently restated the rule that, "'Generally, State agents are afforded immunity from civil liability when the conduct made the basis of the claim is based on the exercise of judgment in supervising and educating students.'" *Ex parte Yancey*, 8 So. 3d 299, 305 (Ala. 2008) (quoting *Ex parte Nall*, 879 So. 2d 541, 544 (Ala. 2003)).  "Educating students includes not only classroom teaching, but also supervising and educating students in all aspects of the educational process." *Ex parte Trottman*, 965 So. 2d 780, 783 (Ala. 2007).

In responding to Nurse Hicks' call to aid Mr. Tidwell, Mr. Parr was exercising his discretion and judgment in supervising students and responding to their concerns at E.H. Gentry. Even though his conduct took place in the residence hall and not in the classroom, Mr. Parr was still acting in his role as an instructor of the students at the facility. Although E.H. Gentry is not a public school in the usual sense of the term, it is a state-funded institution that trains and teaches the visually and hearing impaired residents of the state of Alabama. The court sees no reason to refuse to extend state agent immunity to the state agents acting within their discretionary roles as instructors at E.H. Gentry, such as Mr. Parr.

The Supreme Court of Alabama has established a burden-shifting process when a party raises the defense of State agent immunity:

> In order to claim State-agent immunity, the [State agents] bear the burden of demonstrating that [the plaintiff's] claims arise from a function that would entitle them to immunity. If the [State agents] make such a showing, the burden then shifts to [the plaintiff], who, in order to deny the [State agents] immunity from suit, must establish that the [State agents] acted willfully, maliciously, fraudulently, in bad faith, or beyond their authority.

*Trottman*, 965 So. 2d at 783 (internal citations omitted). Here, Mr. Parr has demonstrated that he exercised discretion in dealing with Mr. Tidwell's injury while acting as an instructor at E.H. Gentry, and as discussed earlier, Mr. Tidwell does not dispute that Mr. Parr was engaged in discretionary action when he took the alleged tortious actions against Mr. Tidwell. The court is satisfied that the actions taken in his role as an educator and supervisor of students at E.H. Gentry were discretionary and qualify Mr. Parr as immune under the fifth *Cranman* category.

Mr. Tidwell argues that Mr. Parr is not immune from the state tort claims charged against him because Mr. Parr was acting willfully, maliciously, in bad faith, and beyond his authority. Willfulness is "the conscious act of doing some act or omission of some duty under knowledge of existing conditions accompanied with a design or purpose to inflict injury," and malice is "[t]he intent, without justification or excuse to commit a wrongful act." *Ex parte Nall*, 879 So. 2d at 546 (citing Instruction 29.01, Alabama Pattern Jury Instructions-Civil (2d ed. 1993) and Black's Law Dictionary, 968 (7th ed. 1999)).  Mr. Tidwell has presented no evidence other than his own opinion indicating that Mr. Parr acted with an "intent, purpose, or design to inflict injury" in allegedly kicking his foot, moving him to the mattress, or moving him from the wheelchair to his girlfriend's car. *See Nall,* 879 So.2d at 546. The court must view all evidence in the light most favorable to Mr. Tidwell, but even doing so, the court can find no evidence of specific intent on Mr. Parr's part to injure Mr. Tidwell. In fact, the evidence of Mr. Parr, Nurse Hicks, and Ms. Holland suggests that Mr. Parr was doing everything in his power to make Mr. Tidwell more comfortable by taking the actions for which Mr. Tidwell now charges him. Thus, the court finds that Mr. Parr did not act willfully, with malice, or in bad faith to try to injure Mr. Tidwell.

22

"A State agent acts beyond authority and is therefore not immune when he or she fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Trottman*, 965 So. 2d at 783 (internal citations omitted). Neither AIDB, E.H. Gentry, nor Mr. Tidwell has produced any rule or regulation that Mr. Parr was required to follow in carrying out his duties as an instructor at E.H. Gentry. The Student Handbook provided by Mr. Tidwell does not provide any guidance on how Mr. Parr should have acted in the situation at hand, and thus he is afforded "broad discretion" in the absence of such specific "rules and policies." *See Ex parte Nall*, 879 So. 2d at 545. Therefore, the court finds that Mr. Parr did not act beyond his authority in confronting the situation involving Mr. Tidwell.

Because Mr. Parr is cloaked with immunity as a state agent under *Cranman* and Mr. Tidwell did not produce any evidence of malicious or willful conduct on Mr. Parr's part to remove that cloak, Mr. Parr is immune from the state tort claims made against him in his personal capacity. For that reason, the court will GRANT summary judgment for Mr. Parr as to counts IV, V, VI, and VII.

F.    Mr.Tidwell's ADA and Rehabilitation Act claims against AIDB and E.H. Gentry

Mr. Tidwell claims that AIDB "failed to accommodate him, as required under the ADA, and instead harassed and discriminated against him because of his condition, and, in express violation of the ADA, terminated him from the program because of her [sic] disabled condition." (Doc. 1, at 7-8). Specifically, Mr. Tidwell claims that AIDB failed to accommodate him by refusing to call him an ambulance and refusing to provide him with a wheelchair. *Id.* AIDB and E.H. Gentry argue that Mr. Tidwell's ADA and Rehabilitation Act claims fail as a matter of law because he cannot establish he was unreasonably denied participation in any program AIDB

23

provided or that any action taken by anyone at E.H. Gentry or AIDB was based on his disability.

The ADA provides that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entities." 42 U.S.C. § 12132.  Similarly, under § 504 of the Rehabilitation Act, "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

The elements to prove a claim under both Title II of the ADA and § 504 of the Rehab Act are substantially the same. "To prevail, a plaintiff must prove three elements: (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *American Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1101 (11th Cir. 2011) (citing *Bircoli v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)).

<u>1.   Is Mr. Tidwell a qualified individual with a disability?</u>

Mr. Tidwell is disabled in that he is legally blind. (Doc. 1, at 3).  Mr. Tidwell argues that on July 23, 2009, he was also "disabled" under the ADA because he was unable to "walk, stand, or care for himself." (Doc. 18, at 17).  "Disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §

24

12102(1). No record of Mr. Tidwell's alleged disability existed on July 23, 2009; Mr. Tidwell

argues that his major life activities were substantially limited by his physical impairment that

later led him to go to the hospital. "Major life activities" include, but are not limited to, "caring

for oneself, performing manual tasks, seeing, hearing, eating, sleeping, *walking, standing,* lifting,

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and

working." *Id.* § 12102(1)(A)(emphasis added). A major life activity also includes the operation of

some major bodily functions, such as bladder functions. *Id.* § 12102(1)(B).

The Defendants point out that "it is not clear that Plaintiff's drop in potassium that lasted

approximately 2-3 days is a disability as defined under the ADA." (Doc. 14, at 19).  Neither party

points the court to any case law stating that a short term temporary incacpcity qualifies as a

"disability" under the ADA.   Resolving all issues of material fact in favor of Mr. Tidwell,

however, the court *assumes* for the purposes of this motion that his temporary inability to walk,

stand, or control his bladder functions qualifies Mr. Tidwell as disabled at the time of the events

giving rise to this lawsuit.

> 2.      Did AIDB exclude Mr. Tidwell from participation in the BEP program or
> deny him of AIDB's benefits and sevices?

"Discrimination under the ADA includes not only adverse employment actions but also

'not making reasonable accommodations' to a plaintiff's known disabilities." *Lloyd v. Housing*

*Auth. of the City of Montgomery, Ala.*, 857 F. Supp. 2d 1252, 1265 (M.D. Ala. 2012) (quoting 42

U.S.C. § 12112(b)(5)(A)).  Mr. Tidwell claims that E.H. Gentry's failure to call an ambulance

and failure to provide him with a wheelchair violated the ADA by "exclud[ing him] from

participation in or den[ying him] benefits of a public entity's services, programs, or activities."

*Harris*, 647 F.3d at 1101.

AIDB argues that even if AIDB had called Mr. Tidwell an ambulance or provided him a wheelchair on July 23, 2009, Mr. Tidwell still would have missed classes in the BEP Program because he did not feel well enough to go to class and had called his girlfriend to come pick him up. By failing to provide Mr. Tidwell with the accommodations he requested, whether they were reasonable or not,  AIDB did not deny Mr. Tidwell of any benefits of the BEP program or services that E.H. Gentry had to offer because, even with the accomodation, Mr. Tidwell would not have been physically able to attend class.  AIDB's failure to provide Mr. Gentry with his requested accommodations does not rise to the level of denial of benefits sufficient to meet the second element of a prima facie case of an ADA or Rehab Act claim.

Mr. Tidwell also argues that AIDB's termination of him from the BEP Program in July 2009 was a denial of the services and benefits of a public entity. The court agrees with Mr. Tidwell that his termination from the program meets the second element of a prima facie claim under the ADA because his termination "exclud[ed him] from participation in or deni[ed him] benefits of a public entity's services, programs, or activities." *Harris*, 647 F.3d at 1101.

### 3.    Was AIDB's termination of Mr. Tidwell because of his disability?

Mr. Tidwell argues that AIDB denied him the opportunity to complete the July 2009 BEP Program or re-enroll in a later BEP program after the July 23, 2009 incident because of his disability. AIDB asserts that Mr. Tidwell did not produce any evidence that it took any action because of his disability.

Mr. Parr testified that AIDB terminated Mr. Parr's enrollment in the BEP program because "he had already missed so much of the class it would be almost impossible to make it up

26

and we had no medical records and we didn't know when we were going to receive them." (Doc. 13-1, at 56).  AIDB retained a spot for Mr. Tidwell in the January 2010 BEP program contingent on AIDB receiving his "medical records indicating that he could meet the physical requirements of the program." *Id.* at 55.  Nurse Hicks also testified that AIDB was trying to gain Mr. Tidwell's medical information "to assess if he was going to be able to function in our program." (Doc. 13-4, at 34).

Mr. McKee, Mr. Tidwell's case worker and "advocate" at E.H. Gentry, stated in an affidavit that he thought "Tidwell should be terminated from the July 2009 BEP Program," because Mr. Tidwell was "progressing very slowly." (Doc. 13-7, at 7).  Mr. McKee also "worried that Mr. Tidwell should not be engaged in the strenuous physical work of the BEP program until he knew and [AIDB] knew it was safe for him." *Id.*

Mr. Tidwell seems to conflate the notion that AIDB terminated his enrollment because of his alleged disability with the notion that AIDB terminated his enrollment because of the classes he missed, partly because of his medical issues. Mr. Tidwell is unable to point to any piece of evidence showing that non-disabled students are not terminated when they miss as many classes as he did. Nor is he able to produce any evidence showing that non-disabled students are not terminated when they fail to submit required and updated medical records to AIDB. The requirement that Mr. Tidwell send in updated medical records does not exhibit any sort of discrimination against him because of his disability; rather, it shows that AIDB wanted to *accommodate* Mr. Tidwell's disability, if at all possible, when he re-enrolled in a later BEP program. In short, Mr. Tidwell has failed to present any evidence other than his own theory that AIDB was motivated by Mr. Tidwell's disability when it terminated him from the July BEP

27

Program.  The court will GRANT summary judgment for AIDB and E.H. Gentry on counts I and II.

IV. CONCLUSION

For the foregoing reasons, the court will GRANT the Defendant's Motion for Summary Judgment on all counts and will DISMISS WITH PREJUDICE all of Mr. Tidwell's claims against AIDB, E.H. Gentry, Mr. Parr, and the fictitious defendants. The court will simultaneously enter an order to that effect.

DONE and ORDERED this 3rd day of January, 2013.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE